[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This matter comes before the court on post judgment motions concerning custody of the parties' two minor children, Thomas born March 12, 1981 and Ryan born April 28, 1988.
Presently, the parties share joint legal custody pursuant to the judgment of dissolution entered on December 22, 1994. The judgment further orders that the defendant mother has physical custody and the plaintiff father has rights of reasonable visitation. That portion of the judgment was entered pursuant to an agreement between the parties. The court, at entry of judgment also made orders regarding a schedule of visitation, which was after hearing. Further schedules of visitation have been ordered. No specific schedule of visitation has ever been ordered regarding the minor child, Thomas. He has not, to the hearing on the motions before this court, seen his father almost four years. There has never been a hearing before the court on the issues of custody, or, visitation as it relates to contested claims of CT Page 9864 custody.
Before this court, the plaintiff father seeks sole legal and physical custody of Ryan with rights of reasonable visitation to the defendant mother, as detailed in his claims for relief. In regard to Thomas, the plaintiff seeks joint legal custody, physical residence with the mother and such orders as would effectively result in a reunification. i.e. contact and communication between himself and Thomas.
The defendant mother seeks sole legal and physical custody of Thomas and seeks the court order no visitation except as initiated by Thomas, with his father. The defendant mother seeks legal custody of Ryan, with the plaintiff father having a specific schedule of visitation.
Each of the children are represented in the proceedings by their own individual counsel. Thomas' counsel has, pursuant to role as described in Newman v. Newman, 235 Conn. 82, 663 A.2d 980
(1995), Schult v. Schult, 241 Conn. 767, ___ A.2d ___ (1997), expressed her client's stated desire to have no contact with his father, to have no court order regarding the same, to not be required by a court to participate in counseling. Further, it is his stated desire that his mother be allowed sole custody of him. Thomas is sixteen (16) years old. No guardian ad litem has been appointed for either child.
Ryan's counsel has advocated before this court for an order of joint legal custody, primacy residence of Ryan with his father, and specific visitation awarded to his mother (to include time for the maternal grandparents). The maternal grandparents are very important in the constellation of nurturing family for these two children, as stated hereinafter.
"`After the final decree, this court has limited the broad discretion given the trial court to modify custody orders under General Statutes sec. 46b-56 by requiring that modification of a custody award be based upon either a material change of circumstances which alters the court's finding of the best interests of the child; Trunik v. Trunik, 179 Conn. 287-290,426 A.2d 274 (1979); Cleveland v. Cleveland, 165 Conn. 95, 100,328 A.2d 691 (1973); Tippin v. Tippin, 148 Conn. 1, 3, 166 A.2d 448
(1960); Sullivan v. Sullivan, [141 Conn. 235, 239, 104 A.2d 898
(1954)]; or a finding that the custody order sought to be CT Page 9865 modified was not based upon the best interests of the child.Stewart v. Stewart, [177 Conn. 401, 407, 418 A.2d 62 (1979)];Simons v. Simons, 172 Conn. 341, 348, 374 A.2d 1040 (1977).' Hallv. Hall, 186 Conn. 118, 122, 439 A.2d 447 (1982); see also Pascalv. Pascal, 2 Conn. App. 472, 278, 481 A.2d 68 (1984)." Senior v.Senior, 4 Conn. App. 94, 96, 492 A.2d 523 (1985).
These requirements apply where the previous custody determination is after contested hearing. While there was no previous contested hearing on custody in this matter, this court need not determine whether the Senior requirements apply because, under the facts of this case, the court finds that there has been a material change of circumstances which alters the court's finding of the best interest of the minor children in the Bowles family.
In evaluating claims for custody, it is elemental and the consistent guiding and unyielding rule that the court determine what is in the best interests of the child(ren). ConnecticutGeneral Statutes § 46b-56. "The award of custody requires the trial court to make difficult and sensitive inquiries into the relationships between adults and children. In the search for an appropriate custodial placement, the primary focus of the court is the best interests of the child, the child's interest in sustained growth, development, well-being, and in the continuity and stability of its environment. [citations omitted.] Such a search requires the court to afford all interested parties an opportunity for a hearing concerning the qualifications of each person who is or may be a candidate for custody. It is essential to inquire into each person's parenting skills as well as his or her relationship with the child." Cappetta v. Cappetta,196 Conn. 10, 16-17, 490 A.2d 96 (1985).
The parties in this matter lived together until December, 1993, at which time Thomas was 11 (almost 12) and Ryan was 4 years old. Until that separation these children had lived with both of the parents. Throughout both children's lives they have spent most of each weekend at the home of their maternal grandparents, the Giordanos. For Ryan, this weekend ritual has been interrupted by his weekend visitation with his father. Through many of the years, including specifically the post-judgment matters now before this court, the Giordanos have also had virtually daily contact with the children, whether in person or on the telephone. CT Page 9866
It is undisputed, through the testimony of both parents, Mrs. Giordano, and Flora White that the Giordanos have been a consistent, nurturing face in the lives of these children. This court has listened to the testimony of various witnesses, observing their demeanor and weighing and evaluating their credibility. Further, the court has had the opportunity to examine the exhibits entered in this matter.
Prior to the parties' separation, the plaintiff father enjoyed a good relationship with both of his sons. Subsequent to the separation, at the age of 11 years, and to this date, Thomas has refused all contact with his father. Ryan has had consistent contact with his father throughout the period since the parties' separation.
A custody and visitation evaluation was performed by Family Services in this matter with a report completed on July 16, 1996 and an updated report completed on April 7, 1997. Both evaluations and reports were prepared by Ms. Flora White. She testified at the custody hearing. No other professionals were retained for purposes of evaluation for this hearing. However, several mental health professionals' (who provided services to the parties or their children) reports were submitted as exhibits into evidence.
Mr. Bowles is an intelligent individual who had a successful career as an attorney, with a real estate business and some teaching on the side. He worked very hard. This success terminated with a meteoric crash occasioned by his suspension from the practice of law in Connecticut, resulting from his mishandling of clients' funds. The family unit suffered great economic hardship at or about the time of the unraveling of Mr. Bowles' career. In the Memorandum of Decision of the trial of the dissolution action, McWeeny, J. made findings regarding these issues. Post dissolution of marriage action, Mr. Bowles has had a couple of different jobs and is currently employed in a sales position, with a geographic territory in Middlesex and New Haven Counties. His work hours have him out of the house most weekdays, arriving home mid to late afternoon each day. His wife is employed as a real estate sales associate; her position allows for a flexible schedule.
Ms. Bowles is attending school on a part-time basis seeking educational training as a paralegal. Previously, she has a high school education. She also works a part-time schedule which on CT Page 9867 most days allows her to be free in the afternoon. Occasionally, she puts in some extra work hours. Her work is in Milford.
Thomas is an excellent student who has also enjoyed extracurricular activities including band and swimming. There are high hopes that he will attend college and continue to excel there. Ryan who is substantially younger than Thomas made a slow adjustment to the Hamden school he attended but ultimately was able to find his way to a comfort level socially; he also is a very good student. He attends religious catechism and played soccer in the Hamden community this past year. Much of his free time is spent with his maternal grandmother.
When Ryan is at his home with his mother and his brother Thomas, he sleeps in Thomas' room, with Thomas, in Thomas' bed. His mother has said she has tried to discourage this but failed to detail any concerted plan or effort by her to encourage Ryan to stay in his own room and/or sleep in a separate bed from Thomas. As a regular routine before he goes to bed at his mother's home, Ryan calls his maternal grandmother to say goodnight. Ryan continues to bedwet at night. Beyond an inquiry to the child's pediatrician no further action has been taken regarding this. Refuge has been taken in the understanding gleaned from the pediatrician that 10% of boys Ryan's age wet their bed at night. No further context has been given to this problem. Ms. Bowles yells a lot in her home, by her own admission. When expressing herself, she is given to a lot of yelling at the children. Family Relations interviews by Flora White with both of the children disclose that throughout the time that the children have lived apart from their father, their mother has had unfavorable things to say about him to them (e.g. Exhibit C, p. 9, line 5; p. 7, line 28-29).
Ryan sleeps in his own bed at his father's house. When Jason is home from college, the room is shared with him. Ryan enjoys a warm and nurturing relationship with his step-mother and is comfortable around her children. There appear to be no sources of anxiety for Ryan in that household on an ongoing basis. He still wets his bed when he sleeps at his Dad's, but Mr. Bowles reports that it has subsided somewhat.
Since the parties' dissolution of marriage, the plaintiff William Bowles has remarried, Deborah Proulx. They live together in Middletown, Connecticut, where her children live with them part-time as a result of a custody sharing relationship that she CT Page 9868 has with their father. Her children have attended the Haddam/Higganum public schools as a result of their father living in that community. He has moved, and as a result, Mr. Bowles and his wife are moving in September, 1997 to Higganum so that her remaining minor child can continue with that School system. They have made arrangements for the leasehold of a home which will provide adequate living quarters for the members of their household. Ms. Deborah Proulx Bowles has three children, Ryan, Jessica and Jason. Ryan is 11 years old, Jessica is 17 years old and Jason has just completed his first year of college. Ryan enjoys a comfortable relationship with his stepmother and his step siblings. Ms. White reports Ryan is affectionate in this household.
Ms. Bowles remains single since the dissolution of marriage. She has been involved in a stormy relationship with a man named Gerald Marcus, which included claims of domestic violence by him toward her and other tumultuous behavior, some of which resulted in the Bowles children's involvement or witnessing of the fractious behavior and its consequences. She has moved on a couple of occasions, such that the children were first in the Bethany School system and, now, are in the Hamden School system, as of this past academic year. Ms. Bowles' purchased the house where she now resides in the Town of Hamden.
This house purchase was after a period of several months where she and the children had no residence of her own, staying for periods of time with different relatives. During this period in 1996, Ryan was very troubled emotionally and showing exacerbated behavior symptomatic of instability.
Ms. Bowles has emphasized to this court that Mr. Bowles is untrustworthy and dishonest as evidenced by his behavior resulting in his suspension from the Bar. She has consistently maintained that he has lied to her about money and hidden it from her. There has been no proof provided of this. While occasionally inappropriately cloying and overly accommodating in his behavior in court, Mr. Bowles showed frank honesty as to his present and past shortcomings before the court. He appears to have learned from the experience of his prior misdeeds and learned the necessity to accept responsibility for his own acts. Mr. Bowles has, on occasion, inappropriately involved Ryan in visitation communications that should have been directed to Ms. Bowles. While this conduct should be frowned upon, Ms. White relates that Mr. Bowles' inappropriate conduct has largely subsided, and he CT Page 9869 shows insight into his behavior and its negative effect on Ryan.
Ms. Bowles on the other hand presents to the court as a woman who will cast mistruths about the father of her children into the wind and let her words land wherever they might regardless of the impact on her children. Further, as the primary physical custodial parent since the date of dissolution, Ms. Bowles has been a poor role model to her children on many fronts. She has failed to be forthright and honest with the Bethany school system when her residence changed in the school year previous to the last. She concocted a plan that she involved Thomas in to have it appear to the Amity school district that Thomas was living in district for the most recent school year; she ultimately abandoned the plan. Ms. Bowles was untruthful to Flora White as to her place of employment and involved Thomas in this deception.
Ms. Bowles has inappropriately involved both Ryan and Thomas in her tumultuous relationship with Gerald Marcus. She engaged in a pursuit of Mr. Marcus in her car while Ryan was in the vehicle. When she was assaulted by Mr. Marcus, of all the courses of action available to her, she chose to go to her parents' house, rouse Thomas, tell him of the assault and then engage with him in the documenting and reporting of the assault. This demonstrates poor understanding of Ms. Bowles as to how to the appropriate roles of parent and child, exposing Thomas to issues which should have been far outside of his realm of dealing at his age. Ms. Flora White of Family Relations gave significant weight to her concern that Ryan would ultimately be influenced by Ms. Bowles attitude toward Mr. Bowles in her evaluations.
The exhibits and testimony reflect a high level of tension between the parties around financial issues about the children. Mr. Bowles from time to time has withheld monies or permission for expenditures in poor judgment. This must be considered, however, in the context of the parties' relationship where, in the past, Ms. Bowles had wished him dead so that the family could have the insurance monies. Both parties' conduct could be better. Ms. Bowles did not continue Ryan in therapy because of cost, but participated in therapy with Gerald Marcus at the exposure of financial cost to herself. That, too, was poor judgment.
There was lengthy cross-examination on a theory known as the parental alienation syndrome, whether it exists and, if so, whether it was present in the Bowles family environment. Distilled, it has been posited by some theoreticians that a child CT Page 9870 such as Thomas does not become so completely alienated from a parent unless the other parent has intentionally or unintentionally derogated the noncustodial parent to cause the alienation. The theory is that the child cannot reach that point of absolute alienation, such as Thomas apparently has, without this kind of negative input from the other parent. This court need not reach the question of the reliability of the claims of the theoreticians espousing the parental alienation syndrome. Whether it is legitimate or not is not a determination necessary for a proper determination of the custodial orders in this case. While Ms. Flora White may have relied on the principles underlying this theory, this court makes its custodial orders based upon its own findings of fact, without regard to that theory.
The court finds that Ms. Bowles in her parenting of Thomas has improperly made him privy to many of her complaints about perceived shortcomings in Mr. Bowles. Many of these issues go to his ability as a financial provider and her personal complaints and assertions of untrustworthiness and dishonesty in Mr. Bowles. None of this information should have been shared by her with Thomas nor should it have been discussed by her in an environment in which Thomas was likely to hear its contents. Mr. Bowles had his own difficulties arising in his relationship with Thomas arising from his suspension from the Bar and his removal from the marital home to the relationship with Deborah Proulx. The suffering of Ms. Bowles, as she experienced it from her relationship with Mr. Bowles was hers alone and not a burden to be shared or imposed upon her children. Ms. Bowles had no logical explanation for this court or for Ms. Flora White as to how Thomas would have been privy to all of her claims of Mr. Bowles being dishonest from any source other than herself. This court finds that behavior of a parent consistently in derogation of the other parent in front of a child, or in an environment where the child will undoubtedly gain access to the information, is not in the best interests of the child. There is nothing in the Bowles matter to suggest that each parent should not honor the other to the ultimate benefit of encouraging the children to have a healthy and positive relationship with both of their parents. In considering the best interests of the minor children, the court may consider which parent is willing to recognize the pivotal importance of the role of the other parent in the life of the child." Savage v. Savage, 25 Conn. App. 693, 699, 596 A.2d 23
(1991). As reported by Ms. White in her first evaluation, Ryan has stated that ". . . his mother says bad things about his CT Page 9871 father but neither his father nor Debbie Proulx say bad things about his mother." The court finds that Ms. Bowles' cavalier indifference to the effects of her negative comments regarding Mr. Bowles in an atmosphere where the information is available to Thomas, display a lack of perception on her part that the children she and Mr. Bowles share need a nurturing and significant relationship with both of their parents. The court finds that this conduct is not in the best interests of the minor child Thomas or the minor child Ryan.
Ms. Bowles has testified that the relationship between Ryan and Thomas is close. There is virtually a seven year age gap between them. Thomas has no relationship with his father, while Ryan does. Thomas has told Flora White that ". . . if he had his way Ryan would not see him [his father] at all because he is a `bad influence.'" Neither Ms. Bowles, nor Thomas, have stopped Ryan from sleeping in the bed with his brother, thereby failing to encourage his independence and continuing maturity. Ryan's and Thomas' relationship can be encouraged and fostered with frequent contact, not necessarily their continued residence in the same home. No evidence was adduced which even suggested that their relationship would be harmed if they live with different parents.
Both of the children, as stated above spend significant amounts of time with Ms. Bowles' parents. Mr. Bowles has affirmed to the court his appreciation of the importance of this relationship to Ryan. The court observed his cross-examination of Mrs. Giordano who was called as a witness by her daughter. The demeanor of Mrs. Giordano as being questioned by her former son-in-law showed no latent hostility. Similarly, throughout the trial, Mr. Bowles' respect of her as the grandmother of his children was evident. Notwithstanding the importance of this grandparent relationship, Ms. Bowles has deprived Ryan of access to his grandparents when she has suffered tension and estrangement in her relationship from her parents. Last summer, while she had some incident which caused an estrangement from her parents for a number of weeks, she did not facilitate any contact between Ryan and the Giordanos. Ms. Bowles has put her emotional needs and reactions ahead of the children's own needs in this area.
Mr. Bowles has a warm, nurturing relationship with Ryan. He has a family schedule which offers stability, predictability and security to Ryan. He is supportive of Ryan's relationship with all of his extended family, including both sets of grandparents. CT Page 9872
This court finds that it is in the best interests of Ryan that he reside primarily with his father. This court cannot find that it is in the best interests of Thomas to reside with his mother. His parenting needs are not well met by Ms. Bowles. However, this youngster has achieved such a high level of alienation from his father that it would be unrealistic and counter-productive to seriously entertain requiring him, at age 16 and as willful as has been indicated, to reconcile with and live with his father. Ultimately this would be the better choice for Thomas. His aversion to his father fed by his mother and confirmed daily to himself by his tautological thinking will prevent any reconciliation for quite some time.
The testimony and exhibits reflect an enduring inability of the parties to communicate and make joint decisions. Under these circumstances the statutory presumption that joint custody is in the best interest of the minor children cannot hold.
The court orders:
1. Sole legal and physical custody of the minor child Thomas is awarded to his mother subject to the father's right of visitation directly, by telephone and written communication or in a counselling/therapeutic environment as the child Thomas will participate in;
2. Sole legal and physical custody of the minor child Ryan is awarded to his father subject to the mother's specific rights of visitation with the minor child as follows:
a. the first, third and fifth weekends of a five week rotating schedule, commencing at the beginning of September, 1997. This visitation shall be from Friday at 5:30 p.m. to Sunday at 7:30 p.m. There shall also be a mid week visit from 5:30 p.m. to 7:30 p.m. on Wednesdays or another mutually agreeable day. Pick up of Ryan by the mother may be at school upon dismissal or when the mother is available from work.
3. The mother is to provide the father with recent photographs of Thomas at least twice a year and inform the father of any major events such as school productions, awards ceremonies, etc. in which Thomas is involved so that the father may attend. CT Page 9873
4. All visitation changes, including changes in stipulated pick up and return times, will be made only through the parents directly, not by leaving messages on voice mail or answering machines and not through Ryan.
5. There will be reasonable telephone contact between Ryan and his mother, generally between the hours of 6:00 p.m. and 8:00 p.m.
6. Summer Vacation July and August:
For 1997, the balance of the court ordered summer visitation shall remain in effect. For future years:
a) Ryan will spend alternating weeks with each parent, the transfer taking place on Monday evenings at 7:30 p.m. Each parent will be responsible for picking up Ryan at the beginning of their week. By written agreement this may be modified to alternating two week blocks for the purpose of planning summer activities for Ryan.
b) Upon thirty days notice to the other parent, two of these weeks may be consecutive for each parent if they have out of state vacation plans which require a longer period of time than one week.
7. School Vacation Weeks:
The Winter and Spring school vacation weeks will be alternated yearly. If either of these weeks is shortened due to the school system's need to make up lost time due to snow days, neither parent will be obliged to offer compensatory time to the other.
8. Holidays:
a) Mother's Day and Father's Day from 10:00 a.m. to 7:30 p.m. will be with the respective parent.
b) Ryan will be with each parent on their Birthday from 5:30 p.m. to 7:30 p.m. if it falls on a weekday, or 10:00 a.m. to 7:30 p.m. if it falls on a weekend. Ryan's Birthday shall be spent with whichever parent has him on that day.
c) The following holidays will be alternated yearly. In even numbered years, the mother will have Memorial Day, Labor Day, and Columbus Day, and the father will have Easter, July 4th and Thanksgiving. In odd numbered years, this sequence should be reversed. The time between Christmas Eve and New Year's Day should be shared, specific arrangements to be made by mutual agreement of the parties. The holiday visitation schedule supersedes the regular visitation schedule.
9. Neither parent will relocate the children's residence outside the state of Connecticut except by mutual written agreement of the parties or further order of the court.
10. Whenever either parent takes the children out of state overnight, they are to provide the other with information regarding destination and telephone numbers for access to the children.
Munro, J.
CT Page 9687